IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-496

No. COA21-580

Filed 19 July 2022

Brunswick County, Nos. 20 CRS 50996, 706

STATE OF NORTH CAROLINA

v.

STEVEN RAY ROUSE, Defendant.

Appeal by defendant from judgment entered on or about 10 March 2021 by Judge Frank Jones in Superior Court, Brunswick County. Heard in the Court of Appeals 5 April 2022.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

> *Dunn, Pittman, Skinner & Cushman, PLLC, by Rudolph A. Ashton, III, for defendant-appellant.*

STROUD, Chief Judge.

Defendant Steven Ray Rouse appeals from a judgment for habitual impaired driving entered following a jury trial. On appeal, Defendant contends the trial court erred when it (1) denied Defendant's motion to suppress an eyewitness identification, (2) denied Defendant's motion to dismiss for insufficiency of the evidence, and (3) instructed the jury on flight as evidence of guilt over Defendant's objection. Because the trial court's unchallenged Findings of Fact support its Conclusions of Law that

the eyewitness identification did not violate Defendant's due process rights or the relevant eyewitness identification statute, we affirm the trial court's denial of the motion to suppress. Further, because the State presented sufficient evidence Defendant drove a vehicle, fled the scene, and took steps to avoid apprehension, we find no error in the trial court's rulings on the sufficiency or jury instruction issues.

## I.    Background

¶ 2        The State's evidence at trial tended to show that on 29 November 2019, Charles Randy Hewett was outside behind his mother's house in Bolivia, North Carolina, when he heard a crash at about 4:40 p.m. Hewett ran to the front yard, arrived at the crash scene "less than a minute" later, and found Defendant sitting with "his nose . . . bleeding a little bit" in the driver's seat of a pickup truck that had crashed nose-first into a ditch alongside the road. No one other than Hewett's family members were around the scene of the crash. Police later determined the truck was registered to Defendant.

¶ 3        After coming upon Defendant at the crash scene, Hewett talked with Defendant and called a phone number at his request. Defendant asked Hewett to assist in pulling the truck out of the ditch, but Hewett declined, and someone called 911. At this point, Defendant grew increasingly "aggravated," and left down the main road toward Highway 17, walking in a "wobbly" manner before he appeared to head down a dirt road into the woods.

¶ 4        Law enforcement arrived on the scene about ten to fifteen minutes after Defendant left.  Hewett gave an officer on the scene, State Highway Patrol Trooper James Ballard, a written description of "a white male [with a] green jacket [and] long sandy brown hair" who had exited the truck and walked up the main road.  Sergeant Keith Bowling of the Brunswick County Sheriff's Office arrived a short time later with a police canine and started to search where Hewett had indicated.  About 15 minutes after arriving, the sergeant said, his K-9 found Defendant "behind a bush" that was three or four feet tall.  Defendant was "laying on the ground" and appeared to be "hiding."  The sergeant estimated Defendant was found "probably within a couple hundred feet" of where Hewett had indicated and about "a quarter mile" from the crash site.  While interacting with Defendant, Sergeant Bowling "noticed a strong odor of alcohol and slurred speech."  Officers also found the keys to Defendant's truck in Defendant's pocket.  After the police dog found Defendant, Sheriff's Deputy Gary Green handcuffed Defendant and eventually put him into the back of his patrol car.  Deputy Green observed Defendant "seemed to be very impaired" and "had trouble walking" because he was "stumbling [and] tripping."

¶ 5        Deputy Green drove Defendant back to the crash site, where the witness, Hewett, was waiting roadside with Trooper Ballard.  The deputy pulled up and rolled down the rear passenger-side window where Defendant was sitting.  In response to Trooper Ballard asking, "Is this the person?",  Hewett responded that he was "[a]

hundred percent" sure the man in the police car was the same man from the crashed truck. Around the same time as this identification, Trooper Ballard noticed Defendant had "a very strong odor of alcohol coming from his breath," "droopy eyelids," and "slurred speech."

¶ 6 Defendant was then taken to a hospital for a "pretty minor" dog bite he sustained when the police dog found him, as Defendant had made "no attempts to warn [police] of his presence." While at the hospital, Defendant refused to consent to a blood test. Trooper Ballard then took Defendant to the Brunswick County jail, obtained a warrant, and had the jail nurse draw the blood sample. A subsequent State Crime Laboratory analysis found Defendant had a blood-alcohol concentration of 0.22.

¶ 7 On 29 November 2019, the same day as the incident, Defendant was charged with driving while impaired "and other related offenses." On 2 March 2020, those charges were dismissed after the State's motion to continue was denied. The State refiled charges for the same conduct the same day but charged Defendant with habitual impaired driving; he was indicted for habitual impaired driving on or about 1 June 2020.[1]

---

[1] Defendant was also indicted on habitual felon status the same day. On the judgment, the trial court "adjudge[d]" Defendant "to be a habitual felon," after Defendant admitted at trial, outside the presence of the jury, to prior felonies sufficient to qualify as a habitual felon.

¶ 8 On 30 April 2020, Defendant filed a motion to suppress "all evidence and statements obtained as the result of a 'show-up' performed in violation of N.C.G.S. § 15-A-284.52(c1)." On 16 November 2020, the trial court held a hearing on Defendant's motion to suppress Hewett's eyewitness identification. At the hearing, Hewett testified about the crash, his interactions with Defendant, and the identification process. Trooper Ballard, Sergeant Bowling, and Deputy Green testified about tracking down Defendant, procuring Hewett's eyewitness identification, and testing Defendant's blood-alcohol concentration. Defendant and the State then argued both the statutory issue[2] and whether the "suggestive procedure" violated constitutional due process.

¶ 9 Following the hearing, the trial court denied Defendant's motion to suppress. The trial court made the following Findings of Fact: Defendant was driving before Hewett heard a crash, ran to the road, and found Defendant behind the steering wheel of a truck in a ditch; "Hewett spent approximately 25-30 minutes at a minimum with the Defendant," who sought help pulling his truck from the ditch; Defendant

---

Defendant did not raise any arguments related to the habitual felon status or conviction on appeal.

[2] Although the written motion to suppress only mentions North Carolina General Statute § 15A-284.52(c1), Defendant's attorney argued at the suppression hearing the trial court needed to also look at the part of the statute "that directs law enforcement to look for the North Carolina Criminal Justice Education and Training Standards Commission for policy," which is § 15A-284.52(c2). N.C. Gen. Stat. § 15A-284.52(c2) (2019).

walked away toward Highway 17 before law enforcement responded; Hewett told officers about "a white man with stringy brown hair wearing what appeared to be a green jacket or hoodie" who "was heading towards Highway 17, and . . . appeared to head through a gate into the woods"; Sergeant Bowling arrived with a police canine who searched and found Defendant behind a bush in the "area consistent with the direction" Hewett had indicated; Defendant was handcuffed, placed in the back of a police vehicle, and taken back to the crash scene for a show-up identification by Hewett that was recorded by police body cameras and dashboard camera; Trooper Ballard performed a show-up identification because he "was concerned with the rapid metabolism and dissipation of alcohol as it related to this Defendant" and the driving while impaired investigation such that he "felt" a show-up identification "was necessary"; and finally Hewett said he was "one hundred percent certain" Defendant was the same man from the truck that had crashed about 80 minutes earlier.

¶ 10        Based on those Findings, the trial court concluded that "proper procedure was followed pursuant to North Carolina General Statute 15A-284.52[(c1)]"; "there was no Due Process violation in regard to the identification procedure"; and "based on the totality of the circumstances, the witness's identification was reliable even if the confrontation procedure was in fact suggestive." The trial court also concluded the identification procedure generally "did not violate the Defendant's rights under the United States Constitution and the North Carolina Constitution." Based on these

conclusions, the trial court denied Defendant's motion to suppress.

¶ 11        Defendant's trial started 8 March 2021 after delays primarily due to COVID-19 shutdowns. Before the trial started, Defendant raised a motion to dismiss due to speedy trial violations, which he had originally filed on 13 April 2020. The trial court denied Defendant's motion to dismiss due to speedy trial violations, noting the COVID-19 enforced delays, Defendant's consent to the only continuance not related to COVID-19, and Defendant's custody on an unrelated charge in another county since October 2020. Defendant raises no issues regarding the speedy trial motion dismissal on appeal.

¶ 12        After jury selection but outside the presence of the jury, Defendant admitted to three prior impaired driving offenses within ten years of the 2019 incident, satisfying one statutory element of habitual impaired driving. N.C. Gen. Stat. § 20-138.5 (2019). The only issue for the jury was whether Defendant was guilty of driving while impaired on 29 November 2019. *See id.* (listing driving while impaired as the other statutory element of habitual impaired driving).

¶ 13        The trial included testimony from Hewett about his interactions with and identification of Defendant. As part of Hewett's testimony, the State introduced Hewett's written statement to police the night of the incident, which recounted his description of Defendant and the direction he saw Defendant go when Defendant left the scene. Trooper Ballard, Sergeant Bowling, and Deputy Green once again testified

for the State about tracking down Defendant, procuring Hewett's eyewitness identification, and testing Defendant's blood-alcohol concentration. As part of his testimony, Trooper Ballard described the crash diagram he had sketched based on his observations at the scene, and the State introduced that diagram into evidence. A forensic scientist from the North Carolina State Crime Laboratory also testified about testing Defendant's blood. As part of this testimony, the State introduced the lab report documenting Defendant's blood-alcohol concentration of 0.22 the night of the crash.

¶ 14    At the close of the State's evidence, Defendant made an oral motion to dismiss based on insufficient evidence, specifically on the issue of whether Defendant drove his truck; the trial court heard a response from the State and denied that motion. After declining to present evidence or witnesses, Defendant renewed the motion to dismiss based on insufficient evidence, which the trial court again denied.

As the parties and court prepared jury instructions, Defendant objected to the State's proposed instruction on flight showing consciousness of guilt. The State argued there was "plenty of evidence" supporting the instruction and "for the jury to consider that [Defendant] did flee from the scene of the accident and from the crime" including that Defendant "went down the road and into the woods" before being found "hiding behind a bush." Defendant argued a flight instruction would be unwarranted and "prejudicial" because Defendant lived "within a mile" of the crash site, was "found

about a fourth of a mile" away, and it was "not a situation where somebody ran from an officer or ignored commands." The trial court ruled "the State [was] entitled to that instruction" because Defendant was not "heading toward a home or toward" a highway. The jury charge included the standard instruction on flight drawn from North Carolina Pattern Jury Instructions for Criminal Cases 104.35:

> The State contends that the defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the defendant's guilt.

¶ 15    The jury found Defendant guilty of driving while impaired. Taking into account Defendant had already admitted to three prior impaired driving offenses, the trial court then sentenced Defendant to 131 to 170 months in prison for habitual impaired driving as enhanced by his status as a habitual felon. Defendant gave oral notice of appeal in open court.

## II.    Motion to Suppress

¶ 16    Defendant contends the trial court erred in denying Defendant's motion to suppress the eyewitness's show-up identification of Defendant. Specifically, Defendant challenges the eyewitness identification on two separate grounds. First, he contends the identification was "impermissibly suggestive" such that "the procedures created a substantial likelihood of irreparable misidentification" in

violation of his constitutional due process rights. Second, he argues "law enforcement failed to follow the recommend procedures under the Eyewitness Identification Reform Act," specifically North Carolina General Statute § 15A-284.52(c1) and (c2). After discussing the standard of review, we address each of the two grounds in turn.

## A. Standard of Review

¶ 17 On appeal, "review of the denial of a motion to suppress is limited to determining whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Malone*, 373 N.C. 134, 145, 833 S.E.2d 779, 786 (2019) (quotations and citations omitted). "Unchallenged findings are deemed supported by competent evidence and are binding on appeal." *State v. Fields*, 268 N.C. App. 561, 566–67, 836 S.E.2d 886, 890 (2019) (citing *State v. Biber*, 365 N.C. 162, 167, 712 S.E.2d 874, 878 (2011)). Challenged findings "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *Malone*, 373 N.C. at 145, 833 S.E.2d at 786 (quotations and citations omitted). "However, the trial court's conclusions of law are fully reviewable on appeal." *Id.* (citation omitted); *see also Fields*, 268 N.C. App. at 567, 836 S.E.2d at 890 ("Conclusions of law are reviewed de novo.").

## B. Analysis

¶ 18 As defined in the Eyewitness Identification Reform Act ("EIRA"), a "[s]how-up" is an identification where "an eyewitness is presented with a single live suspect for

the purpose of determining whether the eyewitness is able to identify the perpetrator of a crime." N.C. Gen. Stat. § 15A-284.52(a)(8). A show-up "'is a much less restrictive means of determining, at the earliest stages of the investigation process, whether a suspect is indeed the perpetrator of a crime,' allowing an innocent person to be 'released with little delay and with minimal involvement with the criminal justice system.'" *State v. Rawls*, 207 N.C. App. 415, 422, 700 S.E.2d 112, 117 (2010) (alteration omitted) (quoting *In re Stallings*, 318 N.C. 565, 570, 350 S.E.2d 327, 329 (1986)).

¶ 19    While show-ups have been criticized, not every show-up identification undermines a conviction. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967) (noting criticism while explaining the standard for overturning convictions based on show-ups), *abrogated on other grounds by U.S. v. Johnson*, 457 U.S. 537, 102 S. Ct. 2579 (1982); *see also State v. Reaves-Smith*, 271 N.C. App. 337, 345, 844 S.E.2d 19, 25 (2020) (noting potential for show-up identifications to be "inherently suggestive" before saying they "are not *per se* violative of a defendant's due process rights" (quoting *State v. Turner*, 305 N.C. 356, 364, 289 S.E.2d 368, 373 (1982))). Rather, appellate courts review the denial of motions to suppress eyewitness identifications, including show-ups, under the constitutional requirement of due process. *See Malone*, 373 N.C. at 146, 833 S.E.2d at 787 (outlining due process review for all eyewitness identifications). Our Courts also review for compliance with EIRA,

but we only evaluate the identification based on the requirements in § 15A-284.52(c1); we do not evaluate based on (c2). *See Reaves-Smith*, 271 N.C. App. at 340–45, 844 S.E.2d at 22–25 (evaluating the trial court's conclusions of law on compliance with (c1) but explaining (c2) "does not place additional statutory requirements on law enforcement" that our courts would review).

### 1. *Due Process*

¶ 20 We first address the constitutional requirements of due process in eyewitness identification. This inquiry asks "whether the identification procedure was so suggestive as to create a substantial likelihood of irreparable misidentification." *Malone*, 373 N.C. at 146, 833 S.E.2d at 787 (quoting *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 697–98 (2001)).

¶ 21 Reviewing courts split this inquiry into two steps, first assessing "whether the identification procedures were impermissibly suggestive." *Id.* (citations and quotations omitted). "If this question is answered negatively, our inquiry is at an end." *State v. Headen*, 295 N.C. 437, 439, 245 S.E.2d 706, 708 (1978). If the answer is affirmative, courts then determine "whether the procedures create a substantial likelihood of irreparable misidentification." *Malone*, 373 N.C. at 146, 833 S.E.2d at 787 (citations and quotations omitted). At this second step, "[t]he central question is whether under the totality of the circumstances the identification was reliable even if the confrontation procedure was suggestive." *Reaves-Smith*, 271 N.C. App. at 345,

844 S.E.2d at 25 (citing *State v. Oliver*, 302 N.C. 28, 45–46, 274 S.E.2d 183, 195 (1981)); *see also State v. Richardson*, 328 N.C. 505, 510, 402 S.E.2d 401, 404 (1991) (clarifying that "totality of the circumstances" applies only to the second step).

¶ 22        Addressing the first step, our courts have determined several different factors bear on whether "the identification procedures were impermissibly suggestive." *Malone*, 373 N.C. at 146, 833 S.E.2d at 787. Our Supreme Court has said show-ups generally may be "inherently suggestive [because] the witnesses would likely assume that the police had brought them to view persons whom they suspected might be the guilty parties." *State v. Matthews*, 295 N.C. 265, 285–87, 245 S.E.2d 727, 739–41 (1978) (finding impermissibly suggestive a show-up at a police station outside which the witness could see a distinctive vehicle resembling the one used in the crime). This Court held a show-up "unduly suggestive" when the defendant was "brought before [the witness] from the back of a police car for identification." *State v. Patterson*, 249 N.C. App. 659, 667, 791 S.E.2d 517, 522 (2016). Officers' leading statements also have led our Supreme Court to conclude a procedure was "unnecessarily suggestive." *Oliver*, 302 N.C. at 45, 274 S.E.2d at 194. Finally, presenting a suspect in handcuffs may have some suggestive influence, but that factor "alone is insufficient to make the show-up impermissibly suggestive." *State v. Lee*, 154 N.C. App. 410, 416, 572 S.E.2d 170, 174 (2002).

¶ 23        Here, Defendant's show-up identification was impermissibly suggestive

because officers exhibited Defendant in a way that "witnesses would likely assume the police had brought them to view persons whom they suspected might be the guilty parties." *Matthews*, 295 N.C. at 285–86, 245 S.E.2d at 739. Like in *Patterson*, Defendant was brought for the show-up in the back of a police car. 249 N.C. App. at 667, 791 S.E.2d at 522. On top of that, Defendant was handcuffed. While this fact alone was not sufficient in *Lee*, 154 N.C. App. at 416, 572 S.E.2d at 174, here, combined with the Defendant being in the back of a police car, we conclude the show-up was impermissibly suggestive.

¶ 24    After affirmatively answering the first question of this two-part test, we next determine "whether the procedures create a substantial likelihood of irreparable misidentification." *Malone*, 373 N.C. at 146, 833 S.E.2d at 787. Post-*Malone*, we continue to rely on five factors to assess the substantial likelihood question:

> [(1)] the opportunity of the witness to view the accused at the time of the crime, [(2)] the witness' degree of attention at the time, [(3)] the accuracy of his prior description of the accused, [(4)] the witness' level of certainty in identifying the accused at the time of the confrontation, and [(5)] the time between the crime and the confrontation.

*Id.*, 373 N.C. at 147, 833 S.E.2d at 787 (quoting *State v. Thompson*, 303 N.C. 169, 172, 277 S.E.2d 431, 434 (1981) (in turn citing *Neil v. Biggers*, 409 U.S. 188, 200, 93

S. Ct. 375, 382 (1971))).[3]

¶ 25      Reviewing courts do not need to find all five factors weigh against a substantial likelihood of irreparable misidentification to admit the evidence over due process concerns. *See Malone*, 373 N.C. App. at 147, 833 S.E.2d at 787–88 (stating in terms of specific question before *Malone* Court about independent origin of in-court identification). Instead, "[a]gainst these factors must be weighed the corrupting effect of the suggestive procedure itself." *State v. Pigott*, 320 N.C. 96, 100, 357 S.E.2d 631, 634 (1987) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2255 (1977)).

¶ 26      Here, the trial court concluded that "based on the totality of circumstances, the witness' identification was reliable even if the confrontation procedure was in fact suggestive." While the trial court did not explicitly address the five reliability factors, they were outlined and argued by counsel at the motion hearing.

¶ 27      Under the standard of review articulated in *Malone*, appellate courts only review the conclusions of law to confirm they are supported by findings of fact that in turn are supported by competent evidence. 373 N.C. at 145, 833 S.E.2d at 786.

---

[3] While *Malone* discusses these factors in the context of "determining whether the witness's in-court identification had the necessary independent origin," 373 N.C. at 147, 833 S.E.2d at 787, it later clarifies this "independent origin inquiry . . . is merely the second part of the due process inquiry" that asks "whether due process requires the suppression of eyewitness identification evidence." 373 N.C. at 148 & n.2, 833 S.E.2d at 788 & n.2.

"[F]indings of fact to which [a] defendant failed to assign error are binding on appeal." *State v. Campbell*, 188 N.C. App. 701, 704, 656 S.E.2d 721, 724 (2008); *see also Fields*, 268 N.C. App. at 566–67, 836 S.E.2d at 890 ("Unchallenged findings are deemed supported by competent evidence and are binding on appeal."). "Here, [D]efendant 'failed to assign error' to any of the trial court's [F]indings of [F]act in the order denying his motion to suppress. Therefore, the trial court's [F]indings of [F]act are binding on appeal." *State v. Williams*, 209 N.C. App. 255, 257, 703 S.E.2d 905, 907 (2011) (citing *Campbell*, 188 N.C. App. at 704, 656 S.E.2d at 724). Using the trial court's binding Findings of Fact, we conclude Hewett's identification was more reliable than that in *Malone*, which our Supreme Court still found "sufficiently reliable." *Id.*, 373 N.C. at 149, 833 S.E.2d at 789.

¶ 28 Turning to the specific factors from *Malone*, first, Hewett had ample opportunity to view the man behind the wheel of Defendant's crashed truck, whom he would later identify as Defendant. In an unchallenged Finding, the trial court found Hewett spent "approximately 25-30 minutes at a minimum" with Defendant before Defendant walked away from the crash. That is far longer than indicated in *Malone*, where two eyewitnesses saw the perpetrators for less than two minutes. 373 N.C. at 149, 833 S.E.2d at 789. Additionally, Hewett did not just see Defendant but also conversed with Defendant, who asked for help pulling his truck from the ditch.

¶ 29 Second, Hewett clearly paid attention while he interacted with Defendant.

Hewett was attentive enough to give the officers a detailed description of "a white man with stringy brown hair wearing what appeared to be a green jacket or hoodie" who "was heading towards Highway 17, and . . . appeared to head through a gate into the woods." Hewett paid close attention because Defendant's arrival—by crashing his truck into a ditch—was out of the ordinary and sufficient to arouse suspicion, much like how a witness in *Malone* paid close attention to a stranger because he approached with hands in his pockets. 373 N.C. at 150, 833 S.E.2d at 789.

¶ 30        Third, Hewett gave a detailed, consistent, and generally accurate description before identifying Defendant. Hewett described the suspect to law enforcement as "a white man with stringy brown hair wearing what appeared to be a green jacket or hoodie." While the trial court did not make Findings on the accuracy of this description and the body cam photos in our record are indiscernible, Defendant's mugshots show Defendant as a white male with long, sandy-brown hair. Hewett thus provided more accurate details than the witness in *Malone* who "accurately described defendant's shoulder-length hair, [which] appears to be the only accurate detail identified by the trial court." 373 N.C. at 150, 833 S.E.2d at 790. In *Malone*, this factor cut for the defendant but was outweighed by the other factors suggesting reliability. 373 N.C. at 152, 833 S.E.2d at 790. Thus, even if the greater accuracy here does not tip this factor in the State's favor, it still does not entitle Defendant to relief on this ground.

¶ 31          Defendant asserts "[s]ome of [Hewett's] descriptions of the perpetrator were inconsistent," apparently in reference to how Defendant appeared at the time, but fails to specify the alleged inconsistencies. Focusing only on Hewett's description prior to the show-up, *see Malone*, 373 N.C. at 147, 833 S.E.2d at 787 (limiting third factor to "accuracy of [witness's] *prior* description of the accused" (emphasis added)), the only potential inconsistency relates to Defendant's clothing. The trial court's unchallenged Finding of Fact indicates Hewett described Defendant to law enforcement as "wearing what appeared to be a green jacket or hoodie." The color of the hoodie in the mugshot photos in our record is open to differing interpretations. Even if we assume this is what Defendant meant regarding inconsistent descriptions and further assume *arguendo* the hoodie from the mugshot photos is not green, Hewett's description otherwise appears accurate. At most, this factor slightly favors Defendant, but that alone does not require us to determine due process bars the show-up identification evidence. *See Malone*, 373 N.C. App. at 147, 150–52, 833 S.E.2d at 787–88, 790 (explaining not all factors need to be met to find no due process violation occurred before concluding no due process violation occurred even though the third factor weighed in the defendant's favor).

¶ 32          Fourth, Hewett expressed absolute certainty Defendant was the man from the truck, with the trial court making an unchallenged Finding that at the time of the show-up, Hewett was "one hundred percent certain that it was the same individual"

he saw earlier. This matches or exceeds the certainty of the witness in *Malone* who testified that, upon seeing another photo of the defendant on social media, "she was sure that he was the" perpetrator. 373 N.C. at 151, 833 S.E.2d at 790. Hewett's confidence also contrasts with a rare case rejecting an identification by a witness who expressed doubt at the time of the identification, among other factors. *Headen*, 295 N.C. at 442–43, 245 S.E.2d at 710.

¶ 33        Finally, the time between the crime and the confrontation was relatively short. The trial court found about 80 minutes had passed between crash and show-up. The trial court also found Hewett spent "approximately 25 to 30 minutes, minimum," with the man in the truck—which means Hewett identified Defendant within an hour of when he had last seen Defendant. That is much faster than indicated in *Malone*, where our Supreme Court noted "*only a week or two* passed between the crime and [the witness's independent] identification of [the] defendant from [a] Facebook picture." 373 N.C. at 151, 833 S.E.2d at 790 (emphasis added).

¶ 34        Overall, at least four of the five reliability factors weigh in favor of finding Hewett's identification of Defendant was reliable, even if the show-up procedure was suggestive. Defendant identifies some ambiguity or imprecision regarding the color of a piece of clothing, but all other elements of Hewett's detailed description are consistent. Even if that one factor weighs in Defendant's favor, the other four factors all weigh strongly in favor of reliability. When considering the totality of the

circumstances and weighing the reliability factors against the corruptive effect of the impermissibly suggestive procedure, Hewett's identification did not present a substantial risk of irreparable misidentification. The trial court therefore did not err in denying Defendant's motion to suppress on the grounds the show-up violated Defendant's due process rights.

¶ 35 Defendant also argues "the in-court identification was tainted by the illegal pretrial procedures." Because the pretrial procedures did not violate due process, they could not have tainted the in-court identification and thus it also did not violate due process.

### 2. *Eyewitness Identification Reform Act ("EIRA")*

¶ 36 In addition to his due process arguments, Defendant contends officers "failed to follow the recommended procedures under the [EIRA]." Defendant notes the EIRA section detailing requirements for show-ups, North Carolina General Statute § 15A-284.52(c1), but does not specify how those requirements may have been violated. Defendant also argues the show-up here ran afoul of standards under § 15A-284.52(c2).

¶ 37 Looking at § 15A-284.52(c1) first, that subsection has three parts that might be applicable, but Defendant cannot successfully challenge any of them. The subsection's first requirement is "a suspect matching the description of the perpetrator is located in close proximity in time and place to the crime." § 15A-

284.52(c1)(1). According to the trial court's unchallenged Findings and as discussed above, Defendant largely matched Hewett's description and was found nearby less than 80 minutes after the crash. That first subsection also limits show-ups to "circumstances that require the immediate display of a suspect to an eyewitness." *Id.* That requirement is satisfied by the trial court's unchallenged Finding that Trooper Ballard was "concerned with the rapid metabolism and dissipation of alcohol . . . and felt that it was necessary to perform a show-up identification" to protect the driving while impaired investigation.

¶ 38 The subsection's second requirement is "using a live suspect" rather than a photograph. § 15A-284.52(c1)(2). The trial court's unchallenged Findings show this requirement is easily satisfied; Defendant was brought before the eyewitness in person.

¶ 39 The subsection's final mandate is that officers "photograph a suspect at the time and place of the show-up to preserve a record of the appearance of the suspect." § 15A-284.52(c1)(3). The trial court found "still pictures were taken at the approximate time [of] the show-up through in car camera and body cam." The record contains images taken from police body-camera recordings, which this Court has recognized as sufficient. *See Reaves-Smith*, 271 N.C. App. at 343, 844 S.E.2d at 24 (concluding officers complied with EIRA requirements when "[t]he show-up identification was conducted with a live person" and "was recorded on the officers'

body cameras"). Therefore, the trial court's unchallenged Findings of Fact support its Conclusion of Law that "proper procedure was followed pursuant to North Carolina General Statute 15A-284.52[(c1)]."

¶ 40 Defendant raises another EIRA issue under § 15A-284.52(c2) arguing officers failed to follow "recommended procedures" by "omitt[ing] standard instructions" and inquiries about the witness's vision and communications with other people. Defendant notes Trooper Ballard testified he did not offer any instructions but "just asked [Hewett] if that was the gentleman he saw in the vehicle."

¶ 41 Section 15A-284.52(c2) provides: "The North Carolina Criminal Justice Education and Training Standards Commission shall develop a policy regarding standard procedures for the conduct of show-ups in accordance with this section. The policy shall apply to all law enforcement agencies and shall address" items including "[s]tandard instructions for eyewitnesses" and "[c]onfidence statements by the eyewitness including information related to the eyewitness' vision, the circumstances of the events witnessed, and communications with other eyewitnesses, if any." N.C. Gen. Stat. § 15A-284.52(c2).

¶ 42 Contrary to Defendant's argument, this Court has held § 15A-284.52(c2) "does not place additional statutory requirements on law enforcement, but rather requires the North Carolina Criminal Justice Education and Training Standards Commission to develop nonbinding guidelines." *Reaves-Smith*, 271 N.C. App. at 344–45, 844

S.E.2d at 25. "[O]nly Section 15A-284.52(c1) sets forth the requirements for show-up identification compliance." *Id.*, 271 N.C. App. at 345, 844 S.E.2d at 25. As a result, according to "[t]he plain language of the statute," the recommended procedures promulgated under (c2) are merely "nonbinding guidelines." *Id.*, 271 N.C. App. at 344, 844 S.E.2d at 25. Thus, Defendant cannot claim a violation of Section 15A-284.52(c2).

We conclude the unchallenged, and therefore binding, Findings of Fact support the trial court's Conclusions of Law on both the due process and EIRA issues. Therefore, we affirm the trial court's denial of Defendant's motion to suppress.

### III. Motion to Dismiss

Defendant next contends the trial court erred in denying Defendant's motion to dismiss for insufficiency of evidence. Specifically, Defendant argues "there was insufficient evidence as a matter of law that he was operating the vehicle." We disagree.

### A. Standard of Review

"In order to justify the denial of a motion to dismiss for insufficient evidence, the State must present substantial evidence of (1) each essential element of the charged offense and (2) defendant's being the perpetrator of such offense." *State v. Privette*, 218 N.C. App. 459, 470–71, 721 S.E.2d 299, 308 (2012) (quotations, citation, and alterations omitted).

¶ 46        "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, 218 N.C. App. at 471, 721 S.E.2d at 308 (quoting *State v. Smith*, 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980)). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Burris*, 253 N.C. App. 525, 544–45, 799 S.E.2d 452, 464 (2017) (quotations and citation omitted); *see also State v. Franklin*, 327 N.C. 162, 171–72, 393 S.E.2d 781, 787 (1990) ("If there is any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction, it is for the jury to say whether it is convinced beyond a reasonable doubt of defendant's guilt.").

¶ 47        In other words, "[t]he trial court need only satisfy itself that the evidence is sufficient to take the case to the jury; it need not be concerned with the weight of that evidence." *Franklin*, 327 N.C. at 171, 393 S.E.2d at 787. As such:

> "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances.

*State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455 (2000) (quoting *State v.*

*Barnes*, 334 N.C. 67, 75–76, 430 S.E.2d 914, 918–19 (1993)).

¶ 48 "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citing *State v. McKinnon,* 306 N.C. 288, 298, 293 S.E.2d 118, 125 (1982)). On appeal, similar to the trial court's approach, "we view 'the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences.'" *Privette*, 218 N.C. App. at 471, 721 S.E.2d at 308 (quoting *State v. Morgan*, 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004)).

## B. Analysis

¶ 49 Here, the only charge for the jury to decide was whether Defendant was driving while impaired. The judgment in turn says Defendant was convicted of Habitual Impaired Driving under North Carolina General Statute § 20-138.5. Habitual Impaired Driving involves driving while impaired in violation of North Carolina General Statute § 20-138.1 and having "been convicted of three or more offenses involving impaired driving as defined in G.S. 20-4.01(24a) within 10 years of the date of this offense." N.C. Gen. Stat. § 20-138.5 (2019). Outside the presence of the jury, Defendant admitted to three prior impaired driving offenses within ten years of the offense date, so the only issue for the jury, and thus for our review of sufficiency, was the driving while impaired under § 20-138.1.

¶ 50 "The essential elements of driving while impaired under Section 20-138.1 are:

'(1) Defendant was driving a vehicle; (2) upon any highway, any street, or any public vehicular area within this State; (3) while under the influence of an impairing substance.'" *State v. Romano*, 268 N.C. App. 440, 453–54, 836 S.E.2d 760, 772 (2019) (quoting *State v. Mark*, 154 N.C. App. 341, 345, 571 S.E.2d 867, 870 (2002)).

¶ 51 Defendant only challenges the sufficiency of the evidence as to the first element, whether he was driving, because "no one saw [him] operating the pick-up truck." Driving means "actual physical control of a vehicle which is in motion or which has the engine running." *Burris*, 253 N.C. App. at 545, 799 S.E.2d at 465 (quoting *Fields*, 77 N.C. App. at 406, 335 S.E.2d at 70).

¶ 52 In *Burris*, this Court found "circumstantial evidence" the defendant drove— namely that the defendant was found sitting in the driver's seat of a car registered to him with the engine off while parked by the front door of a hotel rather than in a parking spot—sufficient alongside the defendant's admission he drove. 253 N.C. App. at 546, 799 S.E.2d at 465. Similarly, in *State v. Clowers*, this Court found evidence the defendant was driving the vehicle on the day in question combined with "circumstantial evidence" that no one else was in the car around the time of the police officers' arrival following an accident sufficient to overrule the defendant's argument the State "merely provide[d] 'a strong suspicion' that he was operating a motor vehicle . . . since no witness identified him as the driver." 217 N.C. App. 520, 526–27, 720 S.E.2d 430, 435 (2011). Both *Burris* and *Clowers* show DWI is no different from any

other area of law when it comes to circumstantial evidence sufficing to "withstand a motion to dismiss and support a conviction." *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455.

¶ 53     Here, viewing the evidence in the light most favorable to the State after *de novo* review, the State presented sufficient circumstantial evidence for us to conclude Defendant was driving the vehicle. Hewett testified he came running from behind the house when he heard the crash, arrived within a minute or so, and found Defendant sitting with a bloody nose in the driver's seat of his own truck, the front of which rested in a ditch, with no one else nearby except Hewett's family members who were at the house before the crash. Thus, similar to *Burris*, a truck registered to Defendant was in a spot where vehicles are not normally parked, i.e., in a ditch by the side of the road, unless they have been driven there recently. 253 N.C. App. at 546, 799 S.E.2d at 465. As in *Clowers*, a witness saw Defendant and only Defendant near the vehicle in the immediate aftermath of a crash. 217 N.C. App. at 526, 720 S.E.2d at 435. Defendant also asked Hewett for assistance in removing his truck from the ditch, indicating his continued intent to possess and control his truck and, one could certainly infer, to avoid interaction with law enforcement related to any investigation of the accident.

¶ 54     Further, Defendant had a bloody nose, and a permissible inference from that is that he was in the truck when it crashed and may have hit his nose on the steering

wheel of the truck, thereby indicating he was driving. *See Burris*, 253 N.C. App. at 544, 799 S.E.2d at 464 (giving State "benefit of every reasonable inference" when reviewing sufficiency of the evidence). After leaving the scene on foot, Defendant was then found hiding behind a bush near the scene of the crash, with the truck keys in his pocket. Finally, Defendant made a statement while in jail that could be reasonably considered as an admission of guilt in general, not just of driving; he specifically said the last time he was accused of DWI "he wasn't guilty, but this time he probably was; he was going to go to jail for a long time." Taking this evidence in the light most favorable to the State, the State presented substantial evidence Defendant was driving.

¶ 55        While Defendant accurately notes a lack of *direct* evidence Defendant drove his truck, the above circumstantial evidence is substantial. Our precedents show circumstantial evidence alone may suffice if it supports a reasonable inference, *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455, especially while "giving the State the benefit of all reasonable inferences" on appeal. *Privette*, 218 N.C. App. at 471, 721 S.E.2d 299 at 309 (quotation and citation omitted).

¶ 56        As part of this argument, Defendant cites cases where our courts have found substantial evidence in the past that is "substantially more egregious" or "significantly stronger" than the evidence in this case. (Citing *Romano*, 268 N.C. App. 440, 836 S.E.2d 760, and *Burris*, 254 N.C. App. 525, 799 S.E.2d 452.) This argument

misunderstands the nature of the test for sufficiency of the evidence. The test sets a floor the State's evidence must clear; it does not matter by how much the State's evidence clears that floor. *See Franklin*, 327 N.C. at 171, 393 S.E.2d at 787 ("The trial court need only satisfy itself that the evidence is sufficient to take the case to the jury; it need not be concerned with the weight of that evidence."). Thus, it does not matter if Defendant can find other cases that clear the sufficiency of the evidence floor more substantially than the evidence here; it only matters the State's evidence here is sufficient, as we have detailed already.

¶ 57    Defendant also tries to distinguish certain cases, but we are not convinced. First, Defendant tries to distinguish *Burris* on the grounds the evidence there was "significantly stronger than the evidence in the instant case," but as we have laid out above, that argument carries no weight. Defendant also seeks to distinguish *Clowers* because that defendant was "under continuous observation by a witness while operating the red car and after it crashed." The distinction is minor since Hewett reached the scene within a minute or two and there is no evidence that anyone else left Defendant's truck. Deducing from the circumstances that Defendant drove his truck into the ditch is an eminently reasonable inference to which the State is entitled on appeal. *See Privette*, 218 N.C. App. at 471, 721 S.E.2d at 308 ("On appeal, we view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." (quotations and citation omitted)).

¶ 58        After *de novo* review, viewing the evidence in the light most favorable to the

State, we conclude the State presented sufficient evidence Defendant was driving the

vehicle.  Therefore, we hold the trial court did not err in denying Defendant's motion

to dismiss for insufficient evidence.

## IV.    Jury Instruction on Flight

¶ 59        Finally, Defendant asserts the trial court "erred by instructing the jury on

flight" as "evidence indicating consciousness of guilt" with Pattern Jury Instruction

104.35 over his objection.  (Capitalization altered.)  Defendant specifically argues "the

evidence in this case was insufficient to support the flight instruction because it

showed nothing more than his leaving the scene of the accident and walking in the

direction of his home" whereas the jury instruction can only be given if "there is some

evidence in the record reasonably supporting the theory that the defendant fled after

commission of the crime charged."  Defendant also argues giving the instruction "was

prejudicial . . . because a different verdict might have been reached absent this

instruction."  We disagree.

### A.    Standard of Review

¶ 60        "[Arguments] challenging the trial court's decisions regarding jury instructions

are reviewed *de novo* by this Court."  *State v. Golden*, 224 N.C. App. 136, 148, 735

S.E.2d 425, 433 (2012) (alteration in original) (quoting *State v. Osorio*, 196 N.C. App.

458, 466, 675 S.E.2d 144, 149 (2009)).  "An instruction about a material matter must

be based on sufficient evidence." *Osorio*, 196 N.C. App. at 466, 675 S.E.2d at 149.

**B.    Analysis**

¶ 61      Our courts have long evaluated evidence of a defendant's flight as follows:

> We have held that evidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt.  A trial court may properly instruct on flight where there is some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged.  However, mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight.  There must also be some evidence that defendant took steps to avoid apprehension.

*State v. Lloyd*, 354 N.C. 76, 119, 552 S.E.2d 596, 625–26 (2001) (citations, quotations, and alterations omitted).

¶ 62      "The bar for a defendant taking 'steps to avoid apprehension' such that an instruction on flight will be deemed proper is low." *State v. Bradford*, 252 N.C. App. 371, 377, 798 S.E.2d 546, 550 (2017).  Such steps might include "an action that was not part of [a d]efendant's normal pattern of behavior." *State v. Shelly*, 181 N.C. App. 196, 209, 638 S.E.2d 516, 526 (2007).  "The fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper." *State v. Parks*, 264 N.C. App. 112, 118, 824 S.E.2d 881, 886 (2019) (alteration from original removed) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)).

¶ 63      For example, in all the following cases, our courts found no error when the trial

court gave a flight instruction. First, this Court recently found no error in a flight instruction where a defendant left the scene, entered a wooded area, and was found by a police dog "curled in a ball behind a large tree." *State v. Miller*, 275 N.C. App. 843, 852–53, 852 S.E.2d 704, 711–12 (2020). Further, in *State v. Harvell*, the trial court did not err in giving a flight instruction when a defendant fled the scene to a dirt road that an officer said was "not a road that people use for traffic." 236 N.C. App. 404, 412–13, 762 S.E.2d 659, 664–65 (2014). This Court has also held a defendant abandoning his own vehicle was sufficient evidence of flight. *State v. Ethridge*, 168 N.C. App. 359, 363, 607 S.E.2d 325, 328 (2005). Finally, in *State v. Levan*, our Supreme Court rejected the defendant's argument a flight instruction was improper because he "did not merely drive home" but rather told others to conceal or destroy evidence. 326 N.C. 155, 165, 388 S.E.2d 429, 434 (1990).

¶ 64      Here, the record before us contains sufficient evidence tending to show Defendant fled and took steps to avoid apprehension. Defendant exited and abandoned his own vehicle, as in *Ethridge*. 168 N.C. App. at 363, 607 S.E.2d at 328. He walked down a road and turned off onto a dirt road, as in *Harvell*. 236 N.C. App. at 412, 762 S.E.2d at 664. Sergeant Bowling testified his police dog found Defendant "hiding" on the ground "behind a bush," much like the defendant in *Miller* was found hiding behind a tree, 275 N.C. App. at 852, 852 S.E.2d at 711–12, and Defendant "made no attempts to warn [the police searching for him] of his presence." Thus, the

evidence here is sufficient for a flight instruction.

¶ 65        Defendant contends this evidence is insufficient because the record "showed nothing more than his leaving the scene of the accident and walking in the direction of his home." As an initial matter, Defendant presenting an alternate explanation for his conduct does not require us to conclude the record lacks sufficient evidence to support a flight instruction; such an instruction may be proper even if "there may be other reasonable explanations for [a] defendant's conduct." *Parks*, 264 N.C. App. at 118, 824 S.E.2d at 886. Additionally, Defendant's argument is not convincing. Defendant may have lived nearby, but his location on the ground behind a bush in the woods off a road shows he "did not merely [go] home." *Levan*, 326 N.C. at 165, 388 S.E.2d at 434.

¶ 66        Defendant also argues someone "who was actually fleeing a crime would certainly go more than" the quarter-mile Defendant covered in about an hour. However, flight does not require successfully making it far from the scene before apprehension, as in *Miller* where the defendant was found in the woods "not far from the scene of the crime." 275 N.C. App. at 852, 852 S.E.2d at 711. As Sergeant Bowling said in the trial testimony Defendant cites: "[T]hey don't always keep running. They can stop and hide." In addition, Hewett described Defendant as "wobbly" as he left the scene of the crash; there was no indication he was moving particularly fast. Defendant seeks to distinguish this case from the "egregious nature of the flight" in

many precedents, but our precedents do not grade flight by its egregiousness. To the extent they discuss weight of the evidence at all, they make clear "[t]he bar for a defendant taking 'steps to avoid apprehension' such that an instruction on flight will be deemed proper is low." *Bradford*, 252 N.C. App. at 377, 798 S.E.2d at 550.

¶ 67 After our *de novo* review, we hold Defendant's actions provided sufficient evidence that he took steps to avoid apprehension and thus clear the low bar to justify the trial court's flight instruction. As a result, we need not reach Defendant's allegation of prejudice because the trial court did not err in giving the instruction.

## V. Conclusion

¶ 68 Having reviewed all Defendant's arguments, we find no error. We affirm the trial court's denial of Defendant's motion to suppress the eyewitness identification because unchallenged Findings of Fact support its legal conclusions on the due process and EIRA issues. The trial court also did not err when it denied Defendant's motion to dismiss for insufficient evidence because, taking the evidence in the light most favorable to it, the State presented sufficient circumstantial evidence the Defendant was driving. Finally, the trial court did not err in instructing the jury on flight because there was sufficient evidence Defendant took steps to avoid apprehension.

AFFIRMED AND NO ERROR.

Judges TYSON and ZACHARY concur.